Good morning, Your Honors. May it please the Court, my name is Timothy Scott. On behalf of the appellant, Mr. Elizondo. Your Honors, we're asking the Court to reverse for two distinct but related reasons in this case. The first one is under the law of the circuit as articulated in the Mena case. It is unconstitutional to question a person about their citizenship status absent a particularized reasonable suspicion that that person is not a citizen. Don't you think it would be a little risky for us to apply that case in light of the Supreme Court granting cert? Well, that is the issue. Do we need to get there? Oh, I think so. Currently, it is the law of the circuit. It might be a newly articulated rule, it might be a controversial rule, but it is the law of the circuit currently, and Mr. Elizondo is entitled to the application of the law of the circuit. Setting aside that argument, the second We wouldn't want to apply Mena as it stands now until after the Supreme Court has rendered its decision, if we were inclined to do that. It probably would be prudent. That would be prudent, wouldn't it? I would imagine that judicial prudence would suggest that we see how Mena comes out, but several issues went up. Has there been argument in Mena yet? I'm sorry? Has there been argument in Mena yet? I'm not certain. I don't know, Your Honor. So is the real question here whether or not they had been seized? Well, that's the second question. Mena says that questioning, even outside of the seizure issue, is unconstitutional, so that's the first part. The second part is, was there a detention, was there a seizure, even setting aside the Mena case? What the government argues, essentially, setting aside Mena, again, for the sake of argument, is that this is a consensual encounter and that there was no seizure. The cases that the government relies upon, Florida v. Royer, this circuit's Kim case, United States v. Kim, all contain a common thread, and that thread is some sort of preparatory exchange between the officer and the person involved in the contact. In Kim, I think it was, do you have a minute for some questions? And I think in Royer it was, do you have a moment, sir? Something in the record to demonstrate that, in fact, the person was free to leave if they wanted to. And it's a crucial distinction that, respectfully, the government has not yet addressed in its briefing, is there was no such exchange. In order for the government's argument to be persuasive in this case, one has to believe that after a Border Patrol agent drives up in a marked vehicle and steps out and identifies himself as a Border Patrol agent in uniform and armed, and without any preparatory comments whatsoever, says, what are you doing here, and what is your citizenship, then a person under the refined objective person standard that this Court has articulated, a person in Mr. Elizondo's shoes, who doesn't speak English and who is, in fact, an alien, would feel free to leave those questions, and I would submit those accusatory-sounding questions, hanging in the air, could then turn back and simply walk away. And what I submit to the Court is absent some sort of exchange to begin with, saying, do you mind if I ask you some questions, and without consenting to be asked a few questions, no reasonable person under those circumstances would feel at liberty. Why preparatory questions is the constitutional line? I mean, in this case, the police officer is arguing that he was parked some distance away and that your client and his friends approached him in sort of a consensual gesture toward him. Now, that's a disputed fact, right? That was a disputed fact, and there was a discrepancy between the way the agent described it in his report and in the way he described it at the hearing on the matter. But even if you resolve it that way, that they met in the middle, the reason that I think it's important to have a preparatory comment is to signal to the person that it is, in fact, a consensual encounter. We're comfortable ---- What if the police officer comes running up with his gun out, crouches and says, hi, how are you today? Well, certainly those would be other facts that would suggest that it wasn't a ---- See, that is the constitutional ---- I mean, this line of cases are difficult because I can see arguments that go from no one feels free to leave when a police officer comes up and begins questioning them to, you know, well, if you're really innocent and there's nothing wrong, you can just start walking away, to, well, maybe if you're in South Central, you don't want to turn your back because you might get shot. I mean, there's all sorts of things going on here, and it's trying to find the line. And it will always be under the totality of the circumstances. But the reason I think that the may I ask you a few questions is so important is because we apply a similar standard to other consent searches, for example. It's that bright line is similar to the bright line between, sir, may I look in your trunk, and simply popping open the trunk. Without some sort of prefatory exchange, it's simply conceding or simply acquiescing to a show of authority, particularly under these circumstances where it's a Border Patrol agent who instantly launches into immigration questions. How do you distinguish the bus case where the Supreme Court said it was okay for the police to search passengers on a bus because they felt free to leave? Those cases, again, I think that there was some kind of prefatory comments. This is what we're doing here. And because it was a search, it was a little bit different. They asked, do you mind if we look in the bags, which again gave at least some indication that this was a consensual encounter, that they didn't have to follow along. There's also an element of it. An officer stationed at the back of the bus and the front of the bus. True, and I think in one of the cases, the officers testified that they stood out of the aisle so as not to block the aisle and make that clear to the people on board. There's also an element about the remoteness of the location. In a bus, it was within public of all the other people who were on the bus. The other persons who were on the bus could see that they were in public view and there wasn't the same concern about intimidation. In this case, there were other houses in the area, but at the same time it was a rather remote location. It was a public fire station, wasn't it? Although I think on the other hand, the officer testified that it was fairly remote, and I don't think there's testimony that there was, for example, sidewalk traffic or a bunch of other citizens sitting on the bus. I am curious about, you know, you look at the cases and they talk about factors that you look for in determining whether or not there was some kind of threats. And they talk about, for instance, several officers as opposed to just a single officer, whether or not the officer displayed a weapon, whether or not the officer actually did some physical touching of the people, whether or not the officer used a loud language or something of that nature, whether or not the officer actually escorted them into a private room or into a patrol car or took a plane ticket in that context or did something of that nature to manifest control. I don't see any of those things in this particular case. And so your focus is on the fact that the officer didn't initially say, may I ask you a question? True. That's the focus of your argument. That's true. What the court just said are all factors to look at, but ultimately the test and the rule is would a reasonable person under circumstances feel free to leave? And the argument is by launching immediately into essentially an oral immigration inspection, a reasonable person specifically in this circumstance would not feel free to turn their back on the officer and walk away. So the officer said, saw some people at a public fire station and said, what are you doing here? But they didn't, initially he spoke in English, didn't understand English. And you find fault with that initial question apparently. What are you doing here? Correct. Correct. It's somewhat accusatory, particularly when followed up immediately with what is your citizenship? Followed up immediately with when did you last come into the country? And then the fourth question after that being, do you have any immigration papers? Did it go like this in English? In English, what are you doing here? A realization that they didn't understand English. And then in Spanish, what are you doing here? What is your nationality? Correct. Okay. I think that's the state of the record. Right. And again. I have a question about, you mentioned yesterday in your remarks that the Ninth Circuit applies a refined reasonable person test. Do you think that's consistent in light of Supreme Court statements in, is it Royer? Drayton. When they talk about the reasonable person, it's the reasonably innocent person. True. And a person could very well be a reasonable innocent person and also not be a citizen of the United States and also not speak English. So I think sort of the group we're thinking of is legal permanent residents, people with visas, people who do have immigration issues, so to speak, but are not guilty of any crime. Would they feel free to walk away when an immigration officer essentially accosts them and asks accusatory sounding questions? So it is a refined test, and you can still assume an innocent person, granting the fact that at the same time the person doesn't speak English and may not be a citizen. With Court's permission, I'd like to reserve a minute for rebuttal. All right. Thank you, counsel. May it please the Court. Good morning, Your Honors. My name is Kevin Mulcahy, and I represent the United States in this matter. The two related issues that the defendant brings up in this case, neither of which have any merit, follow a long consistent line over the last more than 30 years of cases of a consensual encounter between an officer and, in this case, Mr. Elizondo Hernandez. First, though, to put aside the MENA argument or to put that to rest, that was a very unique situation with regard to the amount of force used by the agents. And the language used by the Court was, on these facts alone, which is what I know is cited over and over again by the defendant, on these facts alone we would find a violation here. But that Court took pains at the very beginning of their analysis to say, in order to establish a Fourth Amendment violation, there must be a seizure or a search, and there must be — and then we look at the reasonableness of that search or seizure. They did that at the outset and found, rightfully so, that there was no dispute, that there was a seizure there. Here, there's very much a dispute that there is a seizure. In essence, what the defendant is trying to do is sort of put the cart before the horse. And I think a very important quote and a very important case in that regard is United States v. Kim. And there the Ninth Circuit, this Court, said that where contact between the citizenry and law enforcement officials does not rise to the threshold of the Fourth Amendment event, the predicate for application of the exclusionary rule in Burgon v. Ponce is absent and the agent's motivations for approaching him are irrelevant. And I think that's a very important quote. I think it's directly on point in this case. If we don't get to a Fourth Amendment event, that is, if there is no seizure, then it doesn't matter what his motivations were. Did the government first argue in this case that there was a seizure? That there was a seizure? No, Your Honor. The way that it was briefed below and — There's something in the record that suggested that at the very outset of this proceeding that the government essentially conceded that there was a seizure. Your Honor, actually — And then they changed their position after we sent it back or something. Actually, that's correct, Your Honor. I was thinking that after it had come back, we didn't take that position. But the very — At the very beginning, the government seemed to concede that there was a seizure here. And then after we remanded it, there was an appeal and we remanded it back down.  Correct. Ah, no, there's not a seizure. I think what happened here was there was a finding of reasonable suspicion by the trial court below. The case proceeded to trial. The jury found the defendant guilty. And as we went up on appeal, it was handled by one of our appellate attorneys who I think perhaps spotted this issue and maybe, and I don't know because it was not my case at the time, maybe thought we may have a problem with reasonable suspicion. Yes. He certainly argued that — So you switched to no seizure. Correct. It's kind of a little suspicious when you've taken that one position, you lose, and then you take another position that you think you have a better chance on. Well, we hadn't lost because this was a limited remand the parties agreed upon. So it didn't come before Your Honors with a ruling, and Mr. Scott has been the attorney throughout, and he can correct me if I'm wrong. But my understanding is it did not reach a point here with briefing and argument, but rather it was a limited remand that the parties agreed upon. Your Honor, before the district court, I recognize what happened.  Before the district court, isn't it correct, though, that basically the government basically conceded that there was a seizure here? I believe that that is correct initially. But that issue — but what the district court held was that there was reasonable suspicion. So even if the government had conceded that issue, what I think — even if the government had argued there was a seizure, the focus was whether or not there was reasonable suspicion. I don't think this argument was made by the government below until it came back on Let me understand, though. The reason the reasonable suspicion was a problem was because of the lack of indicia of reliability for the tipster? I would — I believe that that's correct, Your Honor. I caution what I say in that regard only to this effect, which is the district court, on the record that we have now, did not make a finding as to reasonable suspicion. He stopped short of that and indicated that there was no — that there was no seizure. So should this Court believe that there was a seizure, I believe the appropriate thing to do would be to send it back for remand — or remand, excuse me, and send it back down to find out what the judge thought of the testimony. But absent that, that was, I believe — that is an issue. So if we were to go back down, the indicia of reliability of the tip, as well as the other factors set forth or testified to by the agent, I think, would be sort of where we would go with this on the reasonable suspicion angle. Has there been — but there's been a conviction, right? Correct. There was a — there was a conviction, a limited remand agreed upon by the parties, and then a conditional plea agreement. So if Your Honor's — under that conditional plea, if Your Honor's find that we should go back down and have a — that we haven't met our burden, or I guess to say a better way, that there was a seizure, then we, I think — I think the appropriate thing to do is go back down and find the next level of analysis, which is the Fourth Amendment issue. After finding a seizure, was that seizure reasonable? So what happened between the first appearance, you know, the first round in the district court and the second round in the district court that led to government? You know, the lights came on. Big, bright light. Oh, guess what, Judge? There wasn't a seizure here. We were wrong. So, you know, explain that to me. I found that interesting. As did I. And I — I won't pretend to know — I want you to enlighten me on your — I'm not sure I can, Your Honor. I know that it was taken up by one of our appellate attorneys who, frankly, enjoys or likes this issue, likes this consensual encounter issue. And I say that — Well, it makes it easier if there's no — if it's just consent. Right. To be frank — Remember — Upon my reading of the record, I think the initial trial attorney missed the issue. I think that's what happened. Instead, the issue was focused on whether or not there was reasonable suspicion. Well, the district court said it was a hard issue. Correct. So, you know — And so I think what happened — Right. With all due respect to my colleague, I think, you know, she may have dismissed the issue when it got to an appellate attorney who perhaps had some interest in consensual encounter issues as a whole. Boy, that makes justice pretty pertuitous, doesn't it? It just depends on whether the prosecutor happens to have an interest in one issue over another. Well, I think — I think that there was — and in that regard, I think there was an opportunity for the defense. And, again, Mr. Scott can correct me if I'm wrong. But there was an agreement upon the remand for this issue. And I think that that was all contemplated on the remand was that the government would take this position, that this would be an issue that perhaps was missed on the front end, would be brief. But by no means did they — did the judge find that — Let's go to the seizure for a minute. Okay. Sure. Thank you. Okay. This police officer drives up out of the middle of nowhere. It's not like they're in the city streets encountering each other in their normal course of their lives, right? Correct. He drives up to the middle of nowhere. Essentially, yes, Your Honor. And he sees these three people. He's armed. He's in uniform and all that. Where were these people free to go to? Where — I mean, they were there in the middle of nowhere, four — what is it, four miles from the border? Correct. They were supposed to say, oh, hi, Border Patrol agent, we're leaving now? I think they could — it's a little unclear as to what exactly they were doing there in the first place, which I think is what makes the question by the agent very reasonable. What are you doing sort of in the middle of no place at this fire station? What was he doing there? He had responded to an anonymous tip that was — I mean, essentially, in doing his duties, he was told — you know, there was an anonymous tip, so he responded to that area. There isn't — there are a few houses in that area. For example, if these individuals were there — were in the United States lawfully, and perhaps one of the residents in the — the agent did testify below that he didn't know the residents of the area. It's not as though he could identify these folks as strangers. They could have said, you know, look, we have an issue relating to, you know, for the fireman or the fire marshal to answer for us. We're waiting for him to arrive. You know, our car broke down. We're waiting for someone to come pick us up. There are a lot of reasons why an individual could lawfully be at this location. In fact, if there were residents, there's a myriad of issues of why you would want to contact the fire marshal or the fire station there absent of fire, questions, things of that nature. In addition to that, they were free to leave in the sense that there was nothing that — the officer didn't do anything physically, show any force of authority or anything of the like that would make them believe they couldn't go anywhere. Now, it becomes one of these situations where if you or I approach these same three individuals in the middle of nowhere and we walk towards them and they walk towards us, I mean, clearly they're free to leave, but there is that sense that there's going to be a conversation. It's different than if you approach someone, say, in the airport or on the busy street out here where it's sort of okay to sort of walk by with no conversation. But that environment wasn't created by any police hostility. It wasn't created by the Border Patrol agent saying, hey, stop. And I think what's important here and what Your Honor pointed out was there were no movements and no words by the agent prior to the individuals bridging that gap, getting five feet from one another, and then the agent saying, what are you doing here? There was no halt, stop, you know, in the name of the law. I'm from Alaska, and so when I look at this picture, it does not look like in the middle of nowhere. It looks like a metropolis. And that's why you use the phrase in the middle of nowhere. When you're in the middle of nowhere, there's not a fire truck standing by in a paved road and those kind of things. So it's not I guess I use the term in the middle of nowhere. Sort of you should come to Alaska if you want to see nowhere. I've been in and that's that's a crowded area that you're looking at there. I don't see homes in the background and all kinds of things. Correct. There is a home. But I think what the agent testified to and what I think Judge Wardlaw is getting at when she says in the middle of nowhere is that there were it's a sparse community. There weren't a lot of homes in the area. But I do think it's of equal importance that there is a paved road and that this agent was not familiar with who these individuals that lived in the area were. Relative to Los Angeles, say. Correct. Or San Diego. Right. That's what we're talking about. What time of the day did this take place? I believe it's approximately it was early morning. I think about 8, 830 in the morning if my memory serves. And I would like to point out a couple other and I see my time is running low. Your time is over. My time is over. So I should leave. Yes. Thank you, Your Honor. Thank you very much, counsel. Your Honor, with my remaining time, I'd like to pick up on the question that was posed. Where would the people go based on the pseudo remoteness of the area? The problem with this case is that it presents the damned if you do, damned if you don't scenario for Mr. Elizondo. Imagine a situation where the Border Patrol officer drove up and then either asked a question or approached the persons and they chose just to go on their way in this remote location and actually walk the other way. I can't imagine any other conclusion than they would be accused of trying to avoid the Border Patrol agent or of fleeing or of being evasive in some way. And that would automatically, it seems to me, convert to reasonable suspicion in the Border Patrol agent's view. Perhaps even probable cause. Perhaps even probable cause. I can't imagine how this would ever work out for a person like Mr. Elizondo. Either you submit to the Border Patrol's authority or if you don't, then that itself creates some more cause for them to actually go ahead and do a seizure. Another point I wanted to pick up on is Mr. Mulcahy pointed out that it was fair for the agent to ask, what are you doing here based on the physical surroundings, that it was fairly remote. What that goes to show is exactly what I was saying, is that this was an accusatory encounter. What are you doing here under the circumstances? And then what is your citizenship? That in itself demonstrates that this is not some chatty consensual conversation, but in fact is accusatory from the beginning. The only thing the agent did wrong, though, was not ask the preparatory question. May I speak to you? Had he done that, the whole issue would be resolved. If he had done that, Mr. Elizondo would have a tough argument today, absolutely. If he had said, do you mind if I ask you a few questions, and Mr. Elizondo said yes, then the agent would be in a lot better shape, much like if an agent said, do you mind if I look in your trunk, and the person says yes, that's fine. That more or less resolves the issue. I agree. That would be very difficult at that point. And finally, the reason that the government is no longer arguing that there is reasonable suspicion or that they sort of abandoned the position that there was a seizure is because it's not even close in terms of whether there was reasonable suspicion. Under this court's case in Morales, an anonymous tip must have a range of details, must predict future behavior, and thirdly, the future behavior must be corroborated by independent police investigation. Not one of those things happened. It was the only thing that the agent could rely upon, because none of the anonymous tipster tests were fulfilled, is Hispanic appearance. And, of course, under Montserrat Camargo, that doesn't – that is not the law, and that is contrary to the law in this circuit. All right. Thank you. Thank you, Your Honor. U.S. v. Elizondo Hernandez is submitted, as is Ybarra v. Boeing, North American. And we will take up Lee v. TRW.
judges: Wardlaw, Paez Beistline